25CA1187 Peo in Interest of ZV 12-24-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1187
Jefferson County District Court No. 23JV30307
Honorable Lindsay VanGilder, Judge

The People of the State of Colorado,

Appellee,

In the Interest of Z.V. and S.V., Children,

and Concerning L.V.,

Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE LIPINSKY
Dunn and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 24, 2025

Kimberly S. Sorrells, County Attorney, Sarah Oviatt, Assistant County
Attorney, Golden, Colorado, for Appellee

Jeffrey C. Koy, Jordan Oates, Lauren Dingboom, Guardians Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski,
Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1      L.V. (mother) appeals the judgment terminating her parent-child legal relationships with Z.V. and S.V. (the children). We affirm.

## I.     Background

¶ 2      In December 2023, police responded to reports of screaming and crying coming from the family's camper trailer, in which they found the children, then three and six years old, locked inside alone. The trailer had no running water, heat, or electricity. One of the children had started a fire because the interior of the trailer was frigid. The children were only dressed in underwear, were using a bucket as a toilet, and could not recall the last time they had eaten or bathed.

¶ 3      When the parents returned to the trailer, police suspected that mother was under the influence. The police found heroin on mother and drug paraphernalia in the trailer. Mother was arrested, charged with child abuse, and eventually sentenced to probation.

¶ 4      The Jefferson County Division of Children, Youth and Families (the Division) filed a petition in dependency and neglect based on this incident and prior reports of the parents' substance use and neglect. The children were placed in foster care, where they

1

remained throughout the case.  The court appointed a guardian ad litem for them.

¶ 5     Mother admitted that the children were in an injurious environment, and the juvenile court adjudicated the children dependent.  Mother agreed to participate in Jefferson County's Family Integrated Treatment Court program.  The court adopted a treatment plan for mother that, as relevant here, required her to (1) complete a substance use component; (2) address her mental health issues; and (3) meet the children's needs for safety, well-being, and permanency.

¶ 6     The guardian ad litem later moved to terminate mother's parental rights.  Following an evidentiary hearing, the court granted the motion and terminated the parent-child legal relationships between mother and the children.

¶ 7     On appeal, mother contends that the court erred by terminating her parental rights for three reasons: (1) it should have afforded mother more time to become a fit parent; (2) the treatment plan was inappropriate; and (3) the Division failed to make reasonable efforts to rehabilitate her.  We disagree.

## II. Termination Criteria and Standard of Review

¶ 8     A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the children were adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 9     Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15, 480 P.3d 682, 686. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10, 486 P.3d 1201, 1204. We review de novo the juvenile court's legal conclusions, including its determination as to whether the human services department satisfied its reasonable efforts obligation. *See id.*; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8, 527 P.3d 404, 407.

¶ 10 It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence, and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### III. Fitness Within a Reasonable Time

¶ 11 Mother contends there was a less drastic alternative to termination of her parental rights — granting her additional time to work on her treatment plan. We disagree, however, that extending the time for mother's compliance with her treatment plan can be characterized as a less drastic alternative to termination. The less drastic alternative analysis turns on whether a permanent or long-term placement arrangement — such as an allocation of parental responsibilities — would conclude the dependency or neglect proceeding without terminating the parent's rights. *See People in Interest of A.R.*, 2012 COA 195M, ¶ 44, 310 P.3d 1007, 1017 (noting that the less drastic alternative analysis involves the consideration of whether a placement alternative — such as an allocation of parental responsibilities — would satisfy the child's best interests).

¶ 12 Rather than rejecting mother's argument outright, however, we construe it as a claim that the court erred by finding that her conduct or condition was unlikely to change within a reasonable time. *See* § 19-3-604(1)(c)(III).

## A. Applicable Law

¶ 13 A parent is unfit if her conduct or condition renders her unable or unwilling to give her child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 14 When deciding whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may consider whether any change occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003). What constitutes a reasonable time is fact specific and varies from case to case. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007).

¶ 15    Because one of the children was less than six years old when the petition in dependency and neglect was filed, the expedited permanency planning (EPP) guidelines applied. *See* §§ 19-1-102(1.6), 19-1-123, C.R.S. 2025. The EPP guidelines require that such a child be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25, 524 P.3d 1209, 1216.

## B.    Analysis

¶ 16    Mother argues that allowing her additional time to comply with her treatment plan would be in the children's best interests because she has made substantial progress on her treatment plan. The court acknowledged that mother had completed some components of her treatment plan. But it also noted that, during the seventeen months this EPP case had been open, mother had yet to acknowledge her role in causing the children's trauma. The court further found that mother could not meet the children's extensive behavioral and therapeutic needs. For these reasons, the court concluded that mother was unfit and could not become fit within a reasonable time.

¶ 17    The record supports the court's findings.  The caseworker testified that the children would likely require long-term therapeutic support because they had "experienced so much trauma early on in life" and had "insecurity about getting their needs met."  The evidence showed that both children met the criteria for post-traumatic stress disorder and that the older child was participating in trauma-focused cognitive behavioral therapy.

¶ 18    In addition, mother had spent only limited family time with the children.  A criminal protection order prevented her from having any contact with the children early in the case.  During that time, mother worked individually with a family-time supervisor to prepare for therapeutic visits with the children.  But after the protective order was lifted, mother was not immediately approved for family time due to her inconsistent engagement with the supervisor, dysregulation in individual sessions, and unpredictability.  Although mother was eventually approved for family time, at the time of the termination hearing, the supervisor still needed to intervene and assist mother in recognizing when the children's trauma response was triggered.  The supervisor opined at the

termination hearing that mother would always need someone to oversee and supervise her care of the children.

¶ 19    Further, the younger child's therapist testified that mother could not begin working with the child in child-parent psychotherapy until mother completed her own foundational sessions with the therapist. The therapist testified that mother continued to minimize the impact of her behavior, including her substance use, on the child, and that it would be detrimental to the child to include a parent with such a "minimizing mindset" in therapy sessions. Moreover, the therapist said that she expected mother to be further along in her therapeutic work by the time of the hearing.

¶ 20    The caseworker opined that mother's conduct was unlikely to change within a reasonable period of time because, even though the case had been open for seventeen months, mother was still having "therapeutic contact for only an hour and a half . . . once a week." The caseworker concluded that, although she had seen some improvement in mother's behavior, mother was still unable to understand or meet the children's needs. *See People in Interest of V.W.*, 958 P.2d 1132, 1134-35 (Colo. App. 1998) (noting that even

8

"increased compliance" over the course of a case may not justify more time).

¶ 21     Moreover, the therapeutic family-time supervisor, the younger child's therapist, and the caseworker agreed that mother had not shown sufficient insight into the children's trauma or her role in causing it to be able to repair her relationship with the children within a reasonable period of time.

¶ 22     Because this evidence supports the court's determination that mother was unlikely to become fit within a reasonable time, we will not disturb the determination.  *See S.Z.S.,* ¶ 29, 524 P.3d at 1217 (explaining that an appellate court will not disturb the juvenile court's finding that a parent could not become fit within a reasonable time when the record supports it).

IV.   Appropriate Treatment Plan

A.     Applicable Law

¶ 23     The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family.  *People in Interest of K.B.,* 2016 COA 21, ¶ 11, 369 P.3d 822, 826.  An appropriate treatment plan is one that is "reasonably calculated to

render the [parent] fit to provide adequate parenting to the child within a reasonable time and that relates to the child's needs." § 19-1-103(12), C.R.S. 2025. We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, which we assess in light of the facts existing at the time the court approved the plan. *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005).

### B. Analysis

¶ 24 Mother argues that her treatment plan was inappropriate because it neither included a domestic violence component nor provided her with victim support and housing resources. Although the court recognized that the parents' relationship was unhealthy, it found no clear evidence of "coercive control [or] domestic violence." The court concluded that the treatment plan was reasonable and capable of being accomplished within a reasonable time, and that no amendments to the treatment plan would have allowed mother to be successful.

¶ 25 The record supports the court's findings. The younger child's therapist and the family-time supervisor testified about the conflict in the parents' relationship and that mother often told professionals

10

she wanted to separate from father. At the time of the termination hearing, mother and father were living apart. The caseworker testified that, shortly before the termination hearing, mother said that "she didn't need additional supports" to separate from father.

¶ 26 Even though the case had been open for seventeen months, mother waited until less than two weeks before the termination hearing to request a modification of her treatment plan to include a domestic violence component. Mother does not cite any evidence in the record showing that, before that time, the Division or the court was on notice of domestic violence concerns requiring additional interventions.

¶ 27 The younger child's therapist testified that mother said she "did not feel physically unsafe" with father, and the family-time supervisor said that she was unaware of any safety concerns in the relationship. The caseworker testified that mother said she did not feel physically unsafe in her relationship with father. The caseworker further testified that, although both parents' individual therapists told her they would not recommend couples counseling if "it would pose a safety concern for either parent," neither said that such counseling would "pose[] a safety concern for either parent."

¶ 28    To address concerns regarding parental conflict, mother's treatment plan required her to complete an anger management evaluation. A representative of the agency that conducted the evaluation told the caseworker that an anger management evaluation was appropriate in the absence of a "domestic violence charge or conviction." The evaluation recommended that mother continue with her existing therapies and participate in a group that, among other things, helps participants establish "relationship boundaries" and "safety within relationships." The caseworker testified that the agency would have made a different treatment recommendation if it had noted concerns that mother "was not receiving adequate services, including for domestic violence treatment."

¶ 29    Furthermore, the caseworker testified that she would not have offered different "treatment groups and services" even if she had known about domestic violence in mother and father's relationship. The caseworker opined that nothing, including a domestic violence evaluation, would have made the treatment plan more successful.

¶ 30    In sum, in the absence of evidence of domestic violence and because the treatment plan included services to address

relationship conflict, the court did not err by finding that the treatment plan was appropriate.

## V. Reasonable Efforts

### A. Applicable Law

¶ 31 Before a juvenile court may terminate parental rights under section 19-3-604(1)(c), a county human services department must make reasonable efforts to rehabilitate the parent and reunify the family whenever appropriate. §§ 19-3-100.5(1), 19-3-208(1), 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" means "the exercise of diligence and care" to reunify parents with their children, and services provided in accordance with section 19-3-208 satisfy the reasonable efforts requirement. § 19-1-103(114); *see People in Interest of E.D.*, 2025 COA 11, ¶ 10, 566 P.3d 1011, 1017. Those services include screenings, assessments, and individual case plans; home-based family and crisis counseling; information and referral services; family time services; and placement services. § 19-3-208(2)(b)(I)-(V).

¶ 32 When evaluating a human services department's efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan. *E.D.*, ¶ 11, 566

P.3d at 1017. But the parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. *Id.* at ¶ 12, 566 P.3d at 1017.

## B. Analysis

¶ 33 Mother asserts that the court erred by finding that the Division made reasonable efforts because, even though it knew of codependency and conflict in the parents' relationship, it did not provide services to address those issues until late in the case. The court acknowledged the evidence of codependency, showing that the parents' relationship was not healthy, but it found that various services were offered to mother to address these issues. The court noted that mother did not take advantage of many of those services and concluded that the Division made reasonable efforts. The record supports the court's findings.

¶ 34 As an initial matter, the record calls into question mother's claim that conflict with father was a barrier to her success. The family-time supervisor testified that father helped "keep [mother] focused and more regulated" and that mother became more stable and engaged because father was involved. The caseworker testified

that, throughout the case, the parents seemed to rely on each other as their primary support.

¶ 35     Nonetheless, the Division offered mother numerous services throughout the case to address the conflict in the parents' relationship:

- As part of treatment court, mother was ordered to attend "Codependency Anonymous" and to "talk through the relationship with her individual therapist."

- As noted above, mother completed an anger management evaluation to assess the conflict in the relationship and to determine "if any specific treatment was needed to help address it."

- The caseworker testified that, five months before the termination hearing, she made a referral for Family Tree, an agency that helps parents "develop a safety plan . . . if they are not feeling safe" in their relationship, assists with "relationship boundaries," and "help[s] [them] get out of unsafe situations."

- The caseworker testified that mother also "had the option to walk into Porch Light," which also offers these types of services.

- As discussed above, the family-time supervisor and both parents' individual therapists recommended couples counseling.

¶ 36 The caseworker testified that mother did not "follow through" with Family Tree or Porch Light and had not started couples counseling because she wanted "to work on her own individual counseling first." And as noted above, the caseworker opined that no other services could have been offered to address the relationship conflict.

¶ 37 In sum, the record supports the court's finding that the Division provided mother with the necessary resources to engage with her treatment plan but that she did not take advantage of those resources.

VI. Disposition

¶ 38 The judgment is affirmed.

JUDGE DUNN and JUDGE KUHN concur.

16